IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

v.

TYLER GILLUM (01),

     Defendant.

Case No. 19-40043-01-DDC

## MEMORANDUM AND ORDER

The government accused defendant Tyler Gillum of running a check kiting scheme while he operated the Plainville Livestock Commission, a federally regulated livestock sale barn operation. It charged him with 31 counts of bank fraud and two counts of making a false statement when he applied for loans. The case proceeded to trial lasting 13 trial days. At the end of the government's evidence, Mr. Gillum moved orally to dismiss all charges under Fed. R. Crim. P. 29. As permitted by rule, the court reserved its judgment on the motion. *See* Fed. R. Crim. P. 29(b). The jury found Mr. Gillum guilty on all 33 charges.

The court now is prepared to decide Mr. Gillum's Rule 29 motion. For reasons explained below, the court denies his motion.

## I.    Background

On May 29, 2019, a grand jury returned an Indictment charging Mr. Gillum with 31 counts of bank fraud, one count of willfully and knowingly falsifying, concealing, and covering up a material fact in a matter within the jurisdiction of the Small Business Administration, and one count of knowingly making a false statement for the purpose of influencing a bank whose deposits were insured by the Federal Deposit Insurance Corporation. Doc. 1.

To support the 31 bank fraud charges, the Indictment alleged that Mr. Gillum engaged in a check kiting scheme. *Id.* at 4–7 (Indictment ¶¶ 11–16). The Indictment explained that check kiting is "a form of check fraud which involves taking advantage of the float—the time between presentment of a check and the actual receipt of funds—to make use of non-existent funds in a checking or other bank account." *Id.* at 4–5 (Indictment ¶ 11). And the "purpose of check kiting is to falsely inflate the balance of a checking account in order to allow written checks that would otherwise bounce to clear." *Id.* The Indictment also alleged that from January 2015 to August 2017, Mr. Gillum "sent more than $2,000,000,000 through interstate facilities of banks, which were unfunded amounts and were the equivalent of obtaining bank money without obtaining actual properly secured loans." *Id.* at 6 (Indictment ¶ 14). And, it charges, over the course of the alleged scheme, Mr. Gillum transferred "a total of approximately 409 Wire Transfers and 7584 checks[.]" *Id.* The 31 bank fraud charges stemmed from 31 of those checks:

| COUNT | FINANCIAL INSTITUTION | CHECK NUMBER & AMOUNT | DATE OF DEPOSIT |
|---|---|---|---|
| 1 | Guaranty State Bank | Check # 4696 for $516,445 | 7/29/2016 |
| 2 | Guaranty State Bank | Check # 4697 for $483,555 | 7/29/2016 |
| 3 | Guaranty State Bank | Check # 4698 for $544,517 | 7/29/2016 |
| 4 | Guaranty State Bank | Check # 4699 for $455,483 | 7/29/2016 |
| 5 | Guaranty State Bank | Check # 4700 for $461,599 | 7/29/2016 |
| 6 | Guaranty State Bank | Check # 4701 for $538,401 | 7/29/2016 |
| 7 | Guaranty State Bank | Check # 4702 for $481,374 | 7/29/2016 |
| 8 | Guaranty State Bank | Check # 4703 for $518,626 | 7/29/2016 |
| 9 | Guaranty State Bank | Check # 4704 for $491,247 | 7/29/2016 |
| 10 | Guaranty State Bank | Check # 4705 for $508,753 | 7/29/2016 |
| 11 | Guaranty State Bank | Check # 4706 for $559,521.69 | 7/29/2016 |
| 12 | CEBT | Check # 41782 for $488,060 | 7/29/2016 |
| 13 | CEBT | Check # 41783 for $507,882 | 7/29/2016 |
| 14 | CEBT | Check # 41784 for $492,118 | 7/29/2016 |
| 15 | CEBT | Check # 41785 for $563,247 | 7/29/2016 |
| 16 | CEBT | Check # 41786 for $436,753 | 7/29/2016 |
| 17 | CEBT | Check # 41787 for $488,364 | 7/29/2016 |
| 18 | CEBT | Check # 41788 for $511,636 | 7/29/2016 |
| 19 | CEBT | Check # 41789 for $518,937 | 7/29/2016 |
| 20 | CEBT | Check # 41790 for $481,063 | 7/29/2016 |

| 21 | Almena State Bank | Check # 52355 for $583,792.17 | 7/21/2017 |
| 22 | Almena State Bank | Check # 52356 for $740,328 | 7/21/2017 |
| 23 | Almena State Bank | Check # 52357 for $978,861 | 7/21/2017 |
| 24 | Almena State Bank | Check # 52358 for $982,436 | 7/21/2017 |
| 25 | Almena State Bank | Check # 52359 for $976,770 | 7/21/2017 |
| 26 | Almena State Bank | Check # 52360 for $980,399 | 7/21/2017 |
| 27 | Landmark National Bank | Check #7117 for $978,416 | 7/21/2017 |
| 28 | Landmark National Bank | Check #7118 for $962,831 | 7/21/2017 |
| 29 | Landmark National Bank | Check #7119 for $943,728 | 7/21/2017 |
| 30 | Landmark National Bank | Check #7120 for $941,447 | 7/21/2017 |
| 31 | Landmark National Bank | Check #7121 for $890,951.95 | 7/21/2017 |

Doc. 1 at 7–8 (Indictment ¶ 18).  The Indictment charged that these checks violated 18 U.S.C. § 1344(1), which makes it a crime knowingly to execute, or attempt to execute, a scheme or artifice to defraud a federally insured financial institution.

In Count 32, the government charged Mr. Gillum with knowingly and willfully falsifying, concealing, and covering up by any trick, scheme, or device a material fact within the jurisdiction of the executive branch of the United States Government.  *Id.* at 9 (Indictment ¶¶ 20–22).  Specifically, the Indictment alleged that Mr. Gillum applied for a $1,500,000 loan from the Small Business Administration (SBA).  *Id.* (Indictment ¶ 21).  And, when he applied for the loan, it asserts that Mr. Gillum concealed from the SBA the material fact that he "had an outstanding loan of $6,137,857 from TBK Bank, Dallas, Texas."  *Id.*  The government alleged this conduct violated 18 U.S.C. § 1001.

Count 33 of the Indictment charged Mr. Gillum with violating Title 18, United States Code, Section 1014.  *Id.* at 9–10 (Indictment ¶¶ 23–25).  This law makes it a crime knowingly to make a false statement to a federally insured bank for the purpose of influencing the bank to make a loan.  To support this charge, the Indictment alleged that Mr. Gillum applied to Almena State Bank—a federally insured bank—for a $500,000 line of credit.  *Id.* at 10 (Indictment ¶ 24). But, when he applied for the line of credit, Mr. Gillum allegedly "concealed the material fact that

3

[he] had signed a promissory note for $6,137,857, in August 2016, to TBK Bank, Dallas, Texas." *Id.*

Trial began on April 5, 2022.  Doc. 137.  At the close of the government's case, Mr. Gillum moved for acquittal on all counts.  The court heard oral argument on the motion.  And, consistent with Fed. R. Crim. P. 29(b), the court reserved its ruling.  After a 13-day trial, the jury convicted Mr. Gillum on all 33 counts.  Doc. 156.  After the verdict, the government responded in writing to Mr. Gillum's Rule 29 motion.  Doc. 158.  This Order delivers the court's decision on the motion.  The analysis begins with the controlling legal standard.

## II.    Legal Standard

Fed. R. Crim. P. 29(a) provides:  "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Subsection (b) of this rule also authorizes the court to reserve decision on a Rule 29 motion and decide it after the verdict.  Fed. R. Crim. P. 29(b).  But, when the court reserves judgment on such a motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved."  *Id.*

When deciding a motion for acquittal, the court must view the evidence in the light most favorable to the government.  *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999).  The court must uphold a guilty verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001).  The court considers direct and circumstantial evidence, plus reasonable inferences drawn from that evidence.  *United States v. Davis*, 1 F.3d 1014, 1017 (10th Cir. 1993).

### III.    Analysis

The court concludes that the government presented ample evidence for a rational jury to convict Mr. Gillum on all counts in the Indictment.  Below, it reviews the § 1344(1) bank fraud counts—Counts 1–31—organizing the analysis bank-by-bank.  Then, the court discusses Counts 32 and 33, which charged Mr. Gillum with concealing a loan from TBK bank when he applied for a Small Business Administration (SBA) loan and a line of credit at Almena State Bank.

### A.    Counts 1–11:  § 1344(1) Guaranty State Bank

Mr. Gillum first argues for acquittal on Counts 1–11.  These counts charge that Mr. Gillum violated 18 U.S.C. § 1344(1) by knowingly executing or attempting to execute a scheme or artifice to defraud Guaranty State Bank.  The relevant jury instruction—to which neither party objected—listed four elements for Counts 1–11:

> 1.    "Tyler Gillum knowingly executed or attempted to execute a scheme or artifice to defraud Guaranty State Bank;"
>
> 2.    "Guaranty State Bank was a financial institution within the meaning of the law; in this case, that means that the government must prove that Guaranty State Bank was insured by the Federal Deposit Insurance Corporation;"
>
> 3.    "Tyler Gillum acted with intent to defraud a financial institution;" and
>
> 4.    "Tyler Gillum placed Guaranty State Bank at risk of civil liability or financial loss."

Doc. 152 at 14.  Mr. Gillum's arguments for acquittal focus on elements one, three, and four. The court reviews each element, in turn, below.

### 1.    Scheme or Artifice to Defraud

The first element § 1344(1) required the government to prove that Mr. Gillum "knowingly executed or attempted to execute a scheme or artifice to defraud Guaranty State Bank."  *Id.*  "A 'scheme or artifice to defraud' includes any design, plan, pattern, or course of

action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *Id.*; *see also* Tenth Circuit Pattern Criminal Jury Instruction 2.58, *Bank Fraud* 18 U.S.C. § 1344.

Mr. Gillum argues he deserves acquittals on these 11 charges because there was "no misrepresentation"  and "no design, pattern, or practice of fraudulent conduct."  He also asserts that the banks knew full well what he was doing.  And, he argues, the government didn't present testimony from any Guaranty employees and the government's bank records, alone, failed to supply the requisite false misstatements.  He bases his argument in large measure on *Williams v. United States*, 458 U.S. 279, 284 (1982).

In *Williams*, the Supreme Court held that "technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as 'true' or 'false[]'" because a check does not "make any representation as to the state of petitioner's bank balance."  *Id.* at 284–85.  But *Williams* arose from a charge under 18 U.S.C. § 1014—making a false statement.  And as one would suspect, making a false statement is an element of a false statement charge under § 1014.  But the same reasoning doesn't apply to § 1344(1) cases for one simple and decisive reason:  a false statement isn't an element of a bank fraud charge.  *See United States v. Swanson*, 360 F.3d 1155, 1162–64 (10th Cir. 2004) (affirming § 1344(1) conviction based on check kiting).  As *Swanson* explains, misrepresentation is but one way for the government to prove the scheme to defraud element.  Under § 1344(1), the government need only "prove that the defendant's scheme defrauded a financial institution."  *Id.* at 1162.  In the check kiting context, § 1344(1) is concerned primarily with the ends of the scheme, not its means.  *Id.*

Indeed, our Circuit "liberally construe[s] the bank fraud statute" and has "clearly held that check kiting, or cross-depositing a series of worthless checks, constitutes a scheme to

defraud under 18 U.S.C. § 1344(1)." *Id.* at 1163 (internal citation omitted) (citing *United States v. Ratchford*, 942 F.2d 702, 704 (10th Cir. 1991) (affirming § 1344(1) conviction for check kiting)). In *Swanson*, the Circuit upheld the district court's rejection of a Rule 29 motion. In that case, defendant argued that the bank had made a conscious decision to allow overdrafts, so there was no scheme. The Tenth Circuit rejected this argument for reasons that conform perfectly to the evidence here. *Swanson* emphasized "that this is not a case of an isolated overdraft or a few occurrences of minor overdrafts. Instead, there were scores of transactions." *Id. Swanson*'s defendant "strategically used" his business account "to circulate the insufficient funds checks among his eleven accounts on a daily basis, in order to take advantage of the float time inherent in the banking system so that his account balances were artificially inflated." *Id.* The Circuit concluded that this pattern of conduct provided "ample evidence for a rational trier of fact to conclude that [defendant] did something more than write checks on accounts with insufficient funds."[1] *Id.*

Viewing the evidence presented against Mr. Gillum in the light most favorable to the government, a reasonable factfinder could find that he executed or attempted to execute a scheme or artifice to defraud Guaranty State Bank. As did the defendant in *Swanson*, Mr. Gillum argues that the banks knew what he was doing. But the government has presented

---

[1]     The court's conclusion here should come as no surprise to Mr. Gillum. Mr. Gillum included his *Williams*-based argument in his proposed jury instructions on the 18 U.S.C. § 1344(1) charges. *See* Doc. 117 at 5–6. The court, as explained above, felt that Mr. Gillum's proposed language—"[W]riting or presenting an insufficient funds check is not a false statement or misrepresentation"—misinterpreted our Circuit's precedent. In its proposed jury instructions, the court proposed the following language, based on *Swanson*: "Writing an insufficient funds check is not, by itself, a false statement or misrepresentation about the sufficiency of the bank account to pay the check. In contrast, cross-depositing a series of insufficient funds checks may constitute a scheme or artifice to defraud." Doc. 149 at 15. At the Rule 30 conference, Mr. Gillum and the government agreed to remove all language about checks as false statements or misrepresentations. They agreed that the language better suited charges under § 1344(2) than § 1344(1).

evidence that Mr. Gillum, on a regular and daily basis, used multiple accounts to circulate insufficient funds checks among a variety of federally insured banks—*i.e.*, "scores of transactions." *Swanson*, 360 F.3d at 1163.  For example, Government's Exhibit 9 showed eleven checks,[2] totaling more than $5.5 million, flowing from the Gillum Cattle Account at Guaranty State Bank to the Plainville Livestock Commission, Inc. (PLC)[3] Custodial Account maintained at Colorado East Bank and Trust.  These millions of dollars flowed between the two banks in just one day.  As in *Swanson*, "this is not a case of an isolated overdraft or a few occurrences of minor overdrafts." *Id.*  So, like *Swanson*, the government presented ample evidence for a rational jury to find a scheme or artifice to defraud.  *Id.*

The government explained Mr. Gillum's check kiting scheme and Guaranty's position within that scheme without calling any witnesses employed by Guaranty State Bank.  But, the government's witnesses explained float time, and how Mr. Gillum manipulated it to inflate his bank balance artificially.  This included the balance of his Gillum Cattle account at Guaranty.  The "scores of transactions" in the check kiting scheme involved two banks:  Guaranty State Bank and Colorado East Bank and Trust.  *See, e.g.*, Gov't Ex. 8; Gov't Ex. 9.  The evidence showed millions of dollars flowing first from the Gillum Cattle Account at Guaranty to the PLC Custodial Account at Colorado East, then flowing from the PLC Custodial Account to the PLC General Account at Colorado East, and finally flowing (via wire transfer) from the PLC General Account back to the Gillum Cattle Account at Guaranty.  The government's expert witness, Randall Wolverton, described this process in careful detail.  He testified that none of the 11

---

[2]        These eleven checks are Counts 1–11.

[3]        Plainville Livestock includes multiple entities, like Plainville Livestock Commission, Inc. and Plainville Livestock, LLC.  The court uses "PLC" to refer to Plainville Livestock Commission, Inc.  But this Order doesn't use the "PLC" abbreviation when it's necessary to differentiate between Plainville Livestock Commission, Inc. and Plainville Livestock, LLC.

checks written on the Guaranty account were supported by sufficient funds.  And Mr. Wolverton testified that this was check kiting activity.  Ultimately, there is "ample evidence for a rational trier of fact to conclude that [defendant] did something more than write checks on accounts with insufficient funds" and, instead, find that defendant had orchestrated a check kiting scheme involving Guaranty State Bank, thus satisfying the first element of the § 1344(1) charges in Counts 1–11.  *Swanson*, 360 F.3d at 1163.

### 2.    Intent to Defraud

Mr. Gillum's next argument for acquittal focuses on the third element of § 1344(1).  He argues that the government failed to prove that he intended to defraud Guaranty State Bank.  A rational jury could have agreed with Mr. Gillum's argument, concluding that Guaranty State Bank knew what defendant was doing so he neither defrauded nor intended to defraud the bank.  But can the court reach the conclusion that Mr. Gillum's motion requires, *i.e.*, that no "rational trier of fact could have found" that the government proved this element beyond a reasonable doubt?  *Haber*, 251 F.3d at 887.  It cannot.  The government presented evidence of Mr. Gillum's intent.  It established that Mr. Gillum ran the entire show, writing or directing others to write checks on accounts with insufficient funds.  Indeed, the checks from Guaranty that form the basis of Counts 1–11 bear Mr. Gillum's signature.  This evidence, viewed in the light most favorable to the government, provides sufficient evidence for a rational jury to conclude that Mr. Gillum intended to defraud Guaranty State Bank as part of his check-kiting scheme.

### 3.    Loss to Guaranty State Bank

Next, Mr. Gillum seeks acquittal on Counts 1–11 because, he contends, the government failed to show that Guaranty State Bank sustained a loss.  He argues that eventually Guaranty

was made whole, and the bank left a line of credit in place for him.  This argument fails for a legal reason:  the controlling law required the government to prove *risk* of loss, not *actual* loss.

Under § 1344(1), the government need only show, beyond a reasonable doubt, that "the bank was put at *potential risk* by the scheme to defraud."  *United States v. Young*, 952 F.2d 1252, 1257 (10th Cir. 1991) (emphasis added); *see also Swanson*, 360 F.3d at 1161 (rejecting argument that government must prove, as separate element, defendant victimized bank by exposing it to an actual loss); Tenth Circuit Pattern Instruction 2.58, *Bank Fraud*.  In *Swanson*, the Circuit affirmed the district court's decision denying a Rule 29 motion because the government had proved that the defendant's check kiting scheme "put the bank at risk of loss equal to the sum of his bank accounts' overdrafts each day[.]"  360 F.3d at 1161.  The court thus rejects Mr. Gillum's argument for acquittal that the government failed to show Guaranty State Bank sustained an actual loss.

In sum, the government presented sufficient evidence of Mr. Gillum's check kiting scheme involving Guaranty State bank for "*any* rational trier of fact" to find "the essential elements of [18 U.S.C. § 1344(1)] beyond a reasonable doubt."  *Haber*, 251 F.3d at 887 (quotation cleaned up).  The court thus denies Mr. Gillum's Rule 29 motion on Counts 1–11.

**B.   Counts 12–20:  § 1344(1) Colorado East Bank and Trust**

Mr. Gillum also moves for acquittal on Counts 12–20, which charge him with defrauding Colorado East Bank and Trust, and thus violating 18 U.S.C. § 1344(1).  His motion on Counts 12–20 fails for much the same reason that his motion on Counts 1–11 failed.

*First*, like his argument for acquittal on Counts 1–11, Mr. Gillum argues for dismissal of Counts 12–20 because "there were no actual false representations made by [him] to any employee of Colorado East."  As explained above, Mr. Gillum makes this argument based on his

narrow interpretation of the "scheme or artifice to defraud" element of § 1344(1).  But a check kiting scheme, by itself, can satisfy this element.  *See Swanson*, 360 F.3d at 1162–63 ("[W]e have clearly held that check kiting . . . constitutes a scheme to defraud under 18 U.S.C. § 1344(1)).  And "misrepresentations" are only one of many different ways for a rational jury to find a "scheme or artifice to defraud."  The Tenth Circuit Pattern Instruction so provides:  "A 'scheme or artifice to defraud' includes any design, plan, pattern or course of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived."  2.58, *Bank Fraud*.  Given our Circuit's broad interpretation of this bank fraud statute, our Circuit's holding that check kiting can satisfy the scheme to defraud element, and the government's ample evidence of check kiting at Colorado East, a rational jury could find the government proved a scheme or artifice to defraud.

*Second*, Mr. Gillum argues that "he was not defrauding anybody" because "the folks at Colorado East were fully aware of what was happening."  He cites testimony by Amanda McPherson, Colorado East's internal auditor, who had concerns about the activity in Mr. Gillum's accounts, but never elevated her concerns to the board of directors.  Other officials at Colorado East, including Alan Peter, told Ms. McPherson that the overdrafts were not a problem.  Mr. Gillum argues that Ms. McPherson, Mr. Peter, and others at Colorado East knew what was happening—the bank knew about the overdrafts and chose to extend him a line of credit and charge him fees.  Thus, Mr. Gillum argues, "no falsehood . . . could even occur[.]"  But this conclusion ignores a disputed factual issue.

The government presented testimony by Colorado East bank officials about their *lack* of knowledge.  For example, Ms. McPherson testified that she was concerned about the PLC

account—she even used the word "panic."  Mr. Peter, the branch manager, testified that he was not aware of the day-to-day activity in Mr. Gillum's accounts.  Mr. Peter expressed his regret that he didn't monitor the accounts properly and wished he had closed Mr. Gillum's accounts sooner.  Dave Reyher, president of Colorado East at the time, testified that when he identified the check kiting scheme, he stopped allowing wire transfers out of the PLC account, and that his stoppage created an overdraft of millions of dollars in the PLC accounts.  This left Colorado East with a $6.1 million loss.  Mr. Peter testified that the accounts' deficits were not secured by any collateral.  The government's expert testified that Colorado East didn't volunteer to loan Mr. Gillum the $6.1 million overdraft—the loss was the result of a check kite.  And the government's expert also testified that while the check kiting scheme occurred in real time, no one at Colorado East realized that the bank had lost money.  Thus, a rational jury could find that Mr. Gillum defrauded Colorado East.

*Third*, Mr. Gillum argues "that there is no loss actually that occurred to Colorado East." Instead, he argues, only "an accounting error" occurred.  As explained above, the government need not prove that Colorado East sustained an actual loss—only that it experienced a risk of loss.  And whether an accounting error occurred is a fact issue for the jury to decide.  Once the bank stopped wire transfers out of the PLC account, the account had an overdraft of more than $6,000,000 that the bank later converted to a promissory note.  Mr. Reyher testified that Mr. Gillum's kiting scheme created a large financial risk for Colorado East.  He also explained why that was so.  Mr. Wolverton, the government's expert, also testified that the account activity between Mr. Gillum's accounts at Guaranty and Colorado East constituted check kiting and the check kiting imposed a risk of loss to the banking system.  In short, the government presented ample evidence and a rational jury found that the alleged check kiting scheme placed Colorado

East at a risk of loss and that risk of loss resulted from the alleged check kiting, not an accounting error.

### C.      Counts 21–26:  § 1344(1) Almena State Bank

Mr. Gillum's motion also seeks acquittal on Counts 21–26, which charge him with defrauding Almena State Bank, violating 18 U.S.C. § 1344(1).  His argument for acquittal on these counts is like his arguments on the other counts:  he contends that Almena knew what was happening.  He argues that the bank allowed overdrafts, and, when an overdraft occurred, Almena merely called Mr. Gillum to ask him to bring money into the bank to bring the account up to speed.

Again, Mr. Gillum's argument ignores a significant fact issue.  Shad Chandler, former CEO of Almena, testified that he became concerned about the PLC accounts when a special agent from the United States Department of Agriculture presented the bank with a subpoena for PLC's deposit accounts.  He testified that he didn't really look at the PLC accounts until Almena received the subpoena.  But the subpoena concerned him, so he looked at the accounts and he immediately identified a check kiting scheme.  Mr. Chandler testified that the check kiting scheme could have caused Almena to sustain a huge loss.  Mr. Chandler contacted Mr. Gillum, and Mr. Gillum told him that the checks resulted from legitimate cattle sales.  Later, Mr. Chandler returned the checks to Landmark National Bank.  And he testified that he didn't catch the check kiting scheme sooner because Almena trusted its customers.

Mr. Chandler also testified that he indeed had an agreement with Mr. Gillum to honor checks he wrote even if there wasn't enough money in the accounts to cover them.  But he testified that this agreement only reached collected funds, and their agreement required Mr. Gillum to make a deposit to cover insufficient fund checks by a certain time, or Almena would

return the checks.  Mr. Chandler testified that he never entered a blanket agreement with Mr. Gillum to cover checks, and when Almena returned the checks to Landmark, he did not violate any agreement he made with Mr. Gillum.

Viewing this evidence in the light most favorable the government, a rational jury could conclude that Mr. Gillum defrauded Almena.  Almena may have honored checks Mr. Gillum wrote even if his accounts lacked money to cover them, but this approach required collected funds.  A jury could conclude that the check kiting scheme, driven by movement of uncollected funds, did not fall within this arrangement.  In short, the government has adduced evidence sufficient to show that Mr. Gillum knowingly executed a scheme or artifice to defraud Almena State Bank.  The court thus denies this aspect of Mr. Gillum's motion for acquittal.

### D.      Counts 27–31:  § 1344(1) Landmark National Bank

Mr. Gillum also asks that the court dismiss Counts 27–31, which charge him with violating 18 U.S.C. § 1344(1) by defrauding Landmark National Bank.  The government alleged that Mr. Gillum cross-deposited PLC's checks drawn on Almena and Rusty Feldhausen's account at Landmark.  Mr. Gillum argues that the charges accusing him of defrauding Landmark are "the weakest of all" because Landmark was Mr. Feldhausen's bank.  So, according to Mr. Gillum, he couldn't have defrauded Landmark because he never made any statements to anyone at Landmark before the alleged kite collapsed.

Again, Mr. Gillum's argument fails for a legal reason:  it misapprehends the elements of a § 1344(1) charge.  They don't require the defendant to speak directly to anyone at the subject bank to satisfy the element that he knowingly executed or attempted to execute a scheme or artifice to defraud Landmark.  "[C]heck kiting, or cross-depositing a series of worthless checks, constitutes a scheme to defraud under 18 U.S.C. § 1344(1)."  *Swanson*, 360 F.3d at 1163.  So, the

14

government need not prove that Mr. Gillum ever talked with anyone at the bank.  It doesn't matter that he didn't have an account at Landmark.  The government has adduced evidence—checks, witness testimony, and bank records—that Mr. Gillum was heavily involved in the cross-depositing of checks between Almena and Landmark as part of the check kiting scheme.

His argument also fails for a factual reason:  the government presented ample evidence that Mr. Gillum defrauded Landmark.  A brief review of testimony by Landmark employees illustrates this point.

For example, Shawn Brack, a Landmark branch manager, testified that she noticed suspicious activity in Mr. Feldhausen's account—large, frequent deposits from PLC—and reported it to Steve Neeland, Mr. Feldhausen's loan officer.  Mr. Neeland testified that, in the fall of 2016, Mr. Feldhausen told Mr. Neeland that he was working with Mr. Gillum and told Mr. Neeland to expect larger checks.  Mr. Neeland thought Mr. Feldhausen was buying cattle at the sale barn or a ranch to resell them.  Mr. Neeland did not ever believe Mr. Feldhausen would use his line of credit to cover Mr. Gillum's obligations and never approved the line of credit for third-party use.  Eventually, Mr. Neeland became concerned for the safety of the bank because Mr. Feldhausen only had a $300,000 line of credit with Landmark, but millions of dollars were flowing through his account.  Mr. Neeland asked Mr. Feldhausen to fix the situation, but he did not.  Then, in August 2017, Almena returned some checks to Landmark, and Landmark faced a shortfall of more than $10,000,000.  Mr. Neeland testified that Landmark terminated his employment because of the Feldhausen-Plainville Livestock situation.  And, he testified, in hindsight, he wished he had dug deeper, talked more with Mr. Feldhausen, and had he discovered that the deposited checks were based on uncollected funds, he never would have honored the checks.

Michael Burns, Mr. Neeland's supervisor and a senior vice president at Landmark, also testified. Mr. Burns testified that Landmark advanced money on behalf of customers with lines of credit if the customer faced an overdraft, but he never approved an overdraft for Mr. Feldhausen. On August 8, 2017, Landmark's deposit operations group notified Mr. Burns that Almena had returned millions of dollars' worth of checks to Mr. Feldhausen's account at Landmark. Mr. Burns testified that the bank faced a $10,000,000 shortfall. Mr. Burns and Mr. Neeland called Mr. Feldhausen, and Mr. Gillum also participated in the call. Mr. Gillum told Mr. Burns that the money came from legitimate cattle sales. Later, Mr. Feldhausen told Mr. Burns that Mr. Gillum held the relevant cattle sale records, and that Mr. Gillum controlled his checkbook (Mr. Feldhausen later confirmed as much). Mr. Burns then met with Mr. Gillum several times. Mr. Gillum attempted to explain to Mr. Burns how the PLC sale barn operated, but Mr. Burns testified that the explanations didn't make any sense, and Mr. Gillum was not transparent in these dealings with Mr. Burns. Mr. Burns also testified that Mr. Gillum told Landmark that Mr. Feldhausen had 4,700 cattle that Mr. Feldhausen could sell to pay Landmark, but Landmark found only 400 head of cattle. Mr. Gillum took full responsibility and told Mr. Burns that Mr. Feldhausen wasn't at fault. And, Mr. Gillum told Mr. Burns it wasn't a check kiting scheme.

Mr. Wolverton, the government's expert, testified about the check kiting at Landmark. He explained a day of transactions between Mr. Feldhausen's account at Landmark and PLC, using Mr. Feldhausen's monthly statement from Landmark. Mr. Wolverton tracked checks—dated July 21, 2017—from the PLC custodial account at Almena to Mr. Feldhausen's personal checking account at Landmark. That same day, checks from Mr. Feldhausen's account were made payable to "PLC". *See* Gov't Ex. 14 at 4. Mr. Wolverton testified that he found the

checks themselves suspicious:  they were sequentially numbered, drawn on the same account, payable to the same entity, with amounts just under $1,000,000 each, and used a signature that didn't appear to match the handwriting on the check.  The banking system's operations gave the checks one business day of "float time."  And the checks hit Landmark on July 24, 2017.  These events provided the jury with a basis to conclude Mr. Gillum had cross-deposited checks between the two accounts, taking advantage of the float time to inflate the account's balance artificially—*i.e.*, check kiting.  Indeed, Mr. Wolverton testified that the systematic exchange of non-sufficient funds checks—worthless, kited checks— on July 21 concealed an actual overdraft of $10,000,000.  Gov't Ex. 15.  The July 21, 2017 checks form the basis of Counts 27–31.

Mr. Wolverton also analyzed deposits between the Almena and Landmark accounts from April 1, 2017, to August 3, 2017.  *Id.* at 2.  During those four months, he found that 95.97% of the deposits in the accounts came from this cross-depositing scheme.  *Id.*  Mr. Wolverton examined the entire history of the kiting scheme and prepared a schedule of kited checks:  1,107 checks from PLC to Mr. Feldhausen, and 1,105 checks from Mr. Feldhausen to PLC.  Gov't Ex. 27-C.  Mr. Wolverton testified that more than one billion dollars' worth of worthless, kited checks crisscrossed between the two accounts.

Viewing the evidence in the light most favorable to the government, a rational jury could conclude that Mr. Gillum defrauded Landmark National Bank.  Mr. Neeland knew that his customer, Mr. Feldhausen, worked with Mr. Gillum, but he thought Mr. Feldhausen was buying and selling cattle for Mr. Gillum.  He thought the large amounts of money and flurry of activity in Mr. Feldhausen's accounts were legitimate cattle sales.  In conversations with Mr. Burns, Mr. Gillum said the money came from legitimate cattle sales.  Mr. Gillum also insisted Mr. Feldhausen wasn't at fault.  And Mr. Gillum told Mr. Burns that the checks between Almena and

Landmark were not check kiting.  But the government presented ample evidence that Mr. Gillum used Mr. Feldhausen's account as part of his check kiting scheme.  Indeed, Mr. Wolverton testified extensively about Mr. Gillum's check kiting scheme between Landmark and Almena. This evidence was more than sufficient to sustain convictions on Counts 27–31.  For that reason, the court denies Mr. Gillum's motion for judgment in his favor.

**E.     Counts 32 and 33:  18 U.S.C. § 1001(a)(1) False Statement to the SBA, 18 U.S.C. § 1014 False Statement to Almena**

Mr. Gillum also moves for acquittal on Counts 32 and 33—charges that accuse him of concealing a loan when he applied for an SBA loan and a line of credit at Almena State Bank. The court addresses these counts together because both concern Mr. Gillum concealing from Almena the TBK loan to the Plainville Livestock Commission, Inc.

Count 32 charged that Mr. Gillum willfully and knowingly falsified, concealed, and covered up by trick, scheme, and device, a material fact in a matter within the jurisdiction of the executive branch of the Government of the United States—here, a loan of $1.5 million by the SBA—by concealing the outstanding $6.1 million loan by TBK Bank.  Count 32 alleges that this concealment violated 18 U.S.C. § 1001.  Count 33 charges that Mr. Gillum knowingly made a false statement for the purpose of influencing Almena State Bank when he applied for a $500,000 line of credit because he concealed the material fact that he'd signed the $6.1 million note to TBK.  Count 33 charged that this concealment violated 18 U.S.C. § 1014.

Mr. Gillum argues that the government's evidence can't support a conviction on these two charges because he didn't hide anything.  Specifically, he points out that when he went "to apply for the SBA loan[,] Almena had in its loan file a UCC for TBK which would have alerted them immediately to the idea that there was a first position on collateral with respect to Mr. Gillum's assets[.]"  A little background puts this argument in a more informative light.

PLC maintained some bank accounts at Colorado East Bank and Trust.  TBK acquired Colorado East.  After the acquisition, TBK closed the PLC accounts and discovered a $6.1 million overdraft.  Mr. Gillum then executed a promissory note to cover this large overdraft.  The TBK loan listed "Plainville Livestock Commission, Inc." as the borrower.  Gov't Ex. 16.  The note for this loan by TBK is dated August 26, 2016.  *Id.* at 1   And the principal amount of the TBK loan was $6,137,857.34.  *Id.*  Mr. Gillum signed the note as president of Plainville Livestock Commission, Inc.  *Id.* at 3.

Later in 2017, PLC sought an SBA loan through Almena State Bank.  Plainville Livestock Commission, Inc. also was the putative borrower for the SBA loan.  *See* Gov't Ex. 17A, 17E.  Mr. Chandler testified that Almena State Bank was a preferred lender with the SBA. He also testified that the borrower had an obligation to provide the bank with certain information it considers during the loan underwriting process.  He explained that the SBA trusted Almena to make lending decisions, and Almena trusted its customers to provide it with material information—particularly outstanding liabilities.

The application process for the SBA loan required Plainville Livestock Commission, Inc., to submit a financial statement.  It completed one, and provided it to Almena as a part of the SBA loan process.  The government introduced Plainville Livestock Commission, Inc.'s financial statement into evidence.  It lists liabilities to Ford Motor and New Holland in the total amount of $92,000.  Gov't Ex. 17C at 1.  In contrast, this financial statement—dated October 31, 2016 and signed by Mr. Gillum—never references Plainville Livestock Commission, Inc.'s $6.1 million loan from TBK.  *Id.*

Three parties—Plainville Livestock LLC, Mr. Gillum, and his wife, Camden Gillum— unconditionally guaranteed the SBA Loan made to Plainville Livestock Commission, Inc.  Gov't

Ex. 17F.  All three guarantors submitted financial statements.  But the financial statement submitted by Plainville Livestock, LLC only mentions liabilities totaling $1,547,500.  Gov't Ex. 17C at 2.  This financial statement never mentions that Plainville Livestock, LLC is a guarantor on the TBK loan to Plainville Livestock Commission, Inc.

The government also introduced into evidence the personal financial statement that Mr. and Mrs. Gillum gave to Almena on October 31, 2016.  Gov't Ex. 17B.  Their personal financial statement lists liabilities totaling $1,374,700, specifying $991,900 in loans payable to banks.  *Id.* But once again, their financial statement never discloses that Mr. and Mrs. Gillum personally and unconditionally guaranteed Plainville Livestock Commission, Inc.'s loan from TBK.  Indeed, the "Contingent Liabilities" section is blank.  *Id.*  Mr. Chandler testified that during his discussions with Mr. Gillum about the SBA loan, Mr. Gillum only disclosed that he owed a small amount of money (around $100,000) to a bank in Plainville.  Mr. Chandler testified that he expected any personal guaranties would appear on Mr. and Mrs. Gillum's financial statement as contingent liabilities.  Mr. Chandler also testified that Almena relied on these financial statements and comments when making the SBA loan.

To assist the SBA loan process, Mr. Chandler requested an accountant to prepare a business valuation of Plainville Livestock Commission, Inc.  Gov't Ex. 18.  The accountant, Galen Pfeifer, performed a valuation as of August 31, 2016, and issued a report dated October 26, 2016.  *Id.* at 1.  Mr. Chandler testified that he would have expected the TBK loan, dated August 26, 2016, to appear in Mr. Pfeifer's "as of August 31, 2016" report.  The TBK loan does not appear in the business valuation.

The SBA loan was approved on November 18, 2016.  Gov't Ex. 17D.  Mr. Chandler testified that he did not know about the TBK loan when making the SBA loan and Mr. Gillum never disclosed to Almena that he owed $6.1 million to TBK.

Against this backdrop of facts, Mr. Gillum moved for acquittal on the charges in Counts 32 and 33, arguing that Almena had a UCC notice in the loan file.  *See* Gov't Ex. 17G.  And the UCC filing, defendant contends, put Almena on notice that TBK had made a loan to Plainville Livestock Commission, Inc.  Clay Madden, a former Almena commercial lender, testified that he overlooked the UCC filing statement in Almena's files.  To be sure, one plausibly could argue that the overlooked filing put Almena possibly on notice of a loan of some kind by TBK to Plainville Livestock Commission, Inc.  But this argument, when advanced to justify the notion that Mr. Gillum is entitled to acquittal on Counts 32 and 33—as it is here—simply misunderstands the operative requirements of those two charges.

Instruction No. 17 identifies the elements of the § 1001(a)(1) charge in Count 32.  Doc. 152 at 22.  Instruction No. 18 does the same for the § 1014 charge in Count 33.  *Id.* at 23.  The operative elements in the two charges required the government to prove beyond a reasonable doubt that:  (a) "Tyler Gillum knowingly and willfully falsified, concealed, or covered up a fact; specifically, that he owed $6,137,857 to TBK Bank" (Count 32); and (b) "Tyler Gillum made a false statement to Almena State Bank by concealing the material fact that he had signed a promissory note for $6,137,857, in August, 2016, to TBK Bank" (Count 33).  *Id.* at 22; *id.* at 23.  Nothing in the Instructions suggests that Mr. Gillum is spared from criminal liability for his false statements if the recipient of those statements—here, Almena—had notice of facts suggesting that he has made or may have made a false statement.  There's good reason that the Instructions don't embrace Mr. Gillum's argument.  Circuit authority rejects it.  *See United States v. Grissom*,

44 F.3d 1507, 1511 (10th Cir. 1995) (finding sufficient evidence to support § 1014 conviction where, though bank discovered defendant's lie, whether "the bank detected Defendant's false or misleading statements is immaterial").

The government introduced Exhibit 17.  In it, Mr. Gillum states, under penalty of perjury, that all the information he provided in the Personal Financial Statement that he provided to Almena State Bank was "true and complete to the best of [his] knowledge."  This evidence furnished sufficient evidence for the jury to conclude that Mr. Gillum had done what § 1001(a)(1) and § 1014 forbid.  And the jury's verdict reveals that they concluded he made those false statements.  In sum, it's no defense to those crimes that Almena suspected—or should have suspected—that Mr. Gillum had lied to the bank.

So, viewing the evidence in the light most favorable to the government, a rational jury could conclude that Mr. Gillum concealed the TBK loan from Almena State Bank and, by extension, the SBA.  The court thus denies Mr. Gillum's Rule 29 motion on Counts 32 and 33.

## IV.    Conclusion

As explained above, the court denies Mr. Gillum's oral motion under Fed. R. Crim. P. 29. The government presented ample evidence of Mr. Gillum's bank fraud—check kiting—at each bank.  And the government presented ample evidence of Mr. Gillum's failure to disclose the TBK loan when he applied for the SBA loan through Almena.  Thus, based on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Haber*, 251 F.3d at 887 (quotation cleaned up).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Tyler Gillum's oral Rule 29 motion is denied.

**IT IS SO ORDERED.**

Dated this 22nd day of June, 2022, at Kansas City, Kansas.

<u>s/ Daniel D. Crabtree</u>
Daniel D. Crabtree
United States District Judge